**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIYONA MUHAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16-cv-09998 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| UNIVERSITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kiyona Muhammad, a secretary working for Defendant University of Chicago
("University"), was fired in the aftermath of an investigation regarding a missing computer. It is
undisputed that Muhammad took the computer from the office of Dr. Christopher Rhodes, a
departing University professor. The parties disagree as to whether she had permission to do so.
Either way, Rhodes asked for the computer back the next day, yet Muhammad did not return it
for nearly four months. The University claims its subsequent investigation revealed that
Muhammad had misled her employer as to the computer's whereabouts and to whom she had
given it, and so the University terminated Muhammad's employment. Muhammad believes she
was actually fired because she is Black. Thus, she has brought this lawsuit alleging race
discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.
§ 2000e *et seq.*, and 42 U.S.C. § 1981. The remaining Defendants include the University,
Rhodes, and Ann Leu, who was Muhammad's supervisor. They have now moved for summary
judgment on all remaining claims. (Dkt. No. 141.) For the reasons that follow, their motion is
granted.

## BACKGROUND[1]

Unless otherwise indicated, the following facts are undisputed.

Muhammad was a full-time secretary in the Endocrinology Section of the University's Department of Medicine. (Pl.'s Resp. to Defs.' Statement of Facts ("PRDSF") ¶¶ 2, 4, Dkt. No. 149.) Muhammad is a Black woman. (*Id.* ¶ 24.) Among other job duties, she provided secretarial support to Rhodes, a now-retired professor in the Endocrinology Section. (*Id.* ¶¶ 2, 25.) The parties dispute Muhammad's chain of command: the University claims that Muhammad had one supervisor, Leu; whereas Muhammad claims that she considered both Leu and Rhodes "to be her bosses." (*Id.* ¶ 4.)

As a University employee, Muhammad was subject to several University policies (*Id.* ¶¶ 12–17.) As relevant here, the policies require employees to conduct themselves with "honesty and integrity . . . when engaging in activities and performing responsibilities on behalf of the University." (*Id.* ¶ 12.) Employees' non-work-related visitors generally are not permitted in the

---

[1] At the summary judgment stage, a party must support its factual contentions by "citing to particular parts of materials in the record" that establish those facts. Fed. R. Civ. P. 56(c)(1)(A); *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). In this District, parties do so by filing a Statement of Material Facts ("SF") or, for the nonmovant, a Statement of Additional Material Facts ("SAF"). L.R. 56.1(a)(2), (b)(3). "Each asserted fact must be supported by citation to the specific evidentiary material . . . that supports it." *Id.* at 56.1(d)(2). The parties here raise numerous objections to each other's proffered material facts. For the most part, the Court addresses objections to specific facts as they arise in the discussion below. One objection, however, warrants mention at the outset.

A number of Defendants' material facts rely, in whole or in part, on Requests for Admission ("RFAs") that Defendants argue should be deemed admitted due to Muhammad's failure to respond to them in a timely manner. *See* Fed. R. Civ. P. 36(a)(3) (providing that a matter is deemed admitted if not answered or objected to in writing within 30 days). Muhammad objects to the facts being deemed admitted, claiming that her counsel did not receive the RFAs during discovery. She further claims that Defendants' counsel has fabricated an exhibit purporting to show that the RFAs were sent to and received by her counsel. Only two of Defendants' material facts rely solely on the RFAs. (Defs.' SF ("DSF") ¶¶ 55–56, Dkt. No. 143.) If considered, those facts arguably strengthen Defendants' positions. But the Court reaches the same conclusions regarding all matters impacting summary judgment, even if the RFAs are disregarded altogether. And so, without deciding the merits of Muhammad's objection, the Court will not consider the RFAs as support for Defendants' claims.

work area during work hours, and instead are restricted to "common, lobby, or break areas." (*Id.* ¶ 15.) Additionally, employees are responsible for acting in the University's best interest when it comes to matters related to their employment, as well as protecting the University's confidential information and preventing its misuse or unauthorized disclosure. (*Id.* ¶¶ 12, 14.) "Confidential information" is defined to include unpublished grant proposals and unpublished research data. (*Id.* ¶ 13.)

The enforcement mechanism for the policies is the Progressive Corrective Action Policy, which sets out guidelines for the University's Corrective Action Process. (*Id.* ¶ 17.) The policy includes a number of corrective actions, such as "counseling or verbal warning; written reprimand and warning; suspension; suspension pending investigation and final determination; specific warning of discharge; and discharge." (*Id.*) Discipline need not proceed in lockstep; rather, the University may repeat, omit, or take out of sequence any of the steps. (*Id.*) Moreover, the University may suspend or discharge an employee on the first instance of "serious misconduct," which includes (but is not limited to) theft (including "unauthorized removal and/or use of University property"); misuse of, damage to, or loss of University property; misuse of confidential information; insubordination; and misuse of the University's electronic information systems. (*Id.*)

In the summer of 2015, Rhodes left active professorship to join Medimmune, a private company. (*Id.* ¶ 26.) Rather than separate entirely from the University, he transitioned to a position as a paid professor emeritus. (*Id.* ¶ 27.) He remained a paid professor emeritus so as to complete work subject to a continuing grant. (*Id.*) But, as part of the job change, he relocated from Chicago to Maryland. (*Id.* ¶ 26.) Because he had ongoing work in Chicago despite relocating to Maryland, he kept his office space at the University. (*Id.* ¶ 27.) Muhammad was

aware of Rhodes's continuing work and that he would be returning "several times a year" to the University. (*Id.* ¶ 29.)

As Rhodes prepared to depart the University, he told Muhammad that she could have some objects from his office. (*Id.* ¶ 34.) The parties dispute what she had permission to take: Rhodes testified that he told Muhammad that she could have a mini stereo and two particular pictures, but she was to leave everything else; Muhammad testified that Rhodes told her she could have whatever was left in the office. (*Id.* ¶ 34(b).) Whatever was actually said, Muhammad took a computer from Rhodes's office. (*Id.* ¶ 30.) Over the weekend of July 11, 2015, Muhammad texted Rhodes to ask for the password to unlock the computer. (*Id.* ¶ 34(c).) Rhodes declined to give her the password and instructed her to return the computer immediately. (*Id.*) He also apologized to Muhammad that he had been unclear about what she had permission to take. (Defs.' Am. Resp. to Pl.'s SAF ("DRPSAF") ¶ 64, Dkt. No. 156.)

Rhodes returned to Chicago from Maryland in August 2015. (PRDSF ¶ 34(d).) Upon realizing that Muhammad had not returned the computer, he instructed her to return it immediately; otherwise, the failure to return it could be construed as theft. (*Id.*) Muhammad contends that Rhodes used the phrase "'felony theft,' which she considered racist." (*Id.* ¶ 30 (internal citations omitted).) He followed up with her in an August 28, 2015, email to make sure she had returned the computer, and she replied that she would do so that night. (*Id.* ¶ 34(e).)

By mid-October 2015, Muhammad had still not returned the computer. (*Id.* ¶ 30.) At that point Leu, who was Section Administrator for the Endocrinology Section, got involved. (*Id.* ¶¶ 3, 30.) Muhammad told Leu that she had taken the computer, that Rhodes had instructed her to return it, and that she could not return it because her nephew—a college student in downstate

Illinois—had it. (*Id.* ¶ 30.) Leu told Muhammad that the computer had to be returned by the following Monday, October 26, 2015. (*Id.*)

Muhammad failed to contact Leu about the computer by October 26, 2015. (*Id.* ¶ 32.) Instead, two days later, Leu reached out to Muhammad, who said she had been unable to retrieve the computer over the weekend because her daughter had homecoming. (*Id.*) Leu consulted with the University's Human Resources ("HR") Department about the issue and, following their advice, gave Muhammad a paid day off on Friday, October 30, 2015, to drive downstate to Illinois State University and retrieve the computer. (*Id.* ¶¶ 35–36.) On Monday, November 2, 2015, Muhammad returned the computer. (*Id.* ¶ 37.)

As it turns out, Muhammad's nephew never had the computer. (*Id.* ¶ 41; DRPSAF ¶ 67.) Rather, after its return, Leu discovered that it had been used by a forty-two-year-old acquaintance of Muhammad's nicknamed DA Smart ("DA Smart"). (PRDSF ¶ 44.) Muhammad testified that it was always her intention that her nephew receive the computer—which, she says, is why she repeatedly told the University that her nephew had it—but the University presents conflicting evidence showing that Muhammad intended for the computer to go to DA Smart. (*Id.* ¶¶ 44, 67.) Whichever version is true, neither party disputes that, during the initial investigatory meetings with University officials, Muhammad repeatedly said that her nephew had the computer. (*Id.* ¶¶ 30, 38.) Indeed, the University operated under that assumption when it gave her a paid day off to go downstate to retrieve it. (*Id.* ¶ 36.)

After Muhammad returned the computer on November 2, 2015, Leu attempted to access it to determine whether any confidential information had been lost but was unable to do so because it was password protected. (*Id.* ¶ 37.) The next day, Leu—along with Chris Yaros and Barb Lindner, the Director of HR and an HR Labor Relations Consultant, respectively—held a

5

meeting with Muhammad and her union representative, Jarvis Grutter. (*Id.* ¶¶ 19, 35, 38.) At that meeting, Muhammad stated that the computer had been with her nephew for the roughly three and a half months it had been gone, and that he had used Geek Squad to reset its password and access the computer. (*Id.* ¶ 38) At the conclusion of the meeting, Muhammad was placed on an indefinite suspension with pay pending further investigation and instructed to collect documentation supporting her story, as well as the computer's password, by November 9, 2015. (*Id.*) Muhammad's documentation consisted of the text message from Rhodes sent in mid-July 2015 asking her to return the computer; she had neither additional support for her story nor the computer's password. (*Id.* ¶ 39.) At this point, Muhammad still maintained that the computer had been with her nephew. (*Id.* ¶¶ 39, 44.)

Because Muhammad had not provided the password, Leu enlisted the University's Information Technology ("IT") staff to reset the password so Leu could access its contents. (*Id.* ¶ 40.) Once she logged in, Leu found an internet browser logged in to DA Smart's Facebook account and was unable to locate "any of the University's confidential research materials." (*Id.*) Instead, Leu found that DA Smart's Facebook friends included Muhammad, with whom he exchanged several messages about the computer. (*Id.* ¶¶ 41–43.)

Leu, Yaros, and Lindner made "several attempts" to meet with Muhammad after November 9, 2015. (*Id.* ¶ 44.) Eventually, on November 23, 2015, they held a meeting with Muhammad and Grutter. (*Id.*) This meeting was the first time the University confronted Muhammad with the information it had collected—including that Muhammad had known that DA Smart, rather than her nephew, had the computer. (*Id.*) At first, Muhammad denied knowing

DA Smart and "suggested he must be associated with her nephew," but she admitted knowing him upon being shown their Facebook messages. (*Id.* ¶ 45.)[2]

Muhammad claims to have had a contentious history with Leu, claiming a long history of actions that Muhammad interprets as racially biased. Muhammad claims that she made a prior complaint about Leu to Lisa Robinson , who was the head of HR at the time, but Robinson disputes that this happened. (DRPSAF ¶ 60.) Muhammad also claims that Leu repeatedly refused to allow her to take professional development classes that non-Black employees were allowed to take. (*Id.* ¶ 80.) Muhammad further asserts that there was a general "buzz" about the hospital being a "very prejudiced place" that treated Black employees "unjustly." (*Id.* ¶ 77.) She does not specify her basis for this knowledge, however, and does not offer any specifics as to this "buzz."

To support her claim that she was treated poorly because of her race, Muhammad identifies two other employees as comparators—that is, similarly situated employees of a different race who Muhammad believes were treated more favorably than she was treated. Lynn Kaczmarz and Cindy Cheers worked in the University's Department of Medicine—Cheers as a Post-Award Administrator and Kaczmarz as the Department's Grant Manager. (PRDSF ¶ 50.) Neither worked in the Endocrinology Section, which is where Muhammad was employed; both reported to Lauren Zajac. (*Id.*)

In December 2012, Kaczmarz and Cheers became aware that a staff member had electronically signed a grant application that required an original "wet" signature. (*Id.* ¶ 51.)

---

[2] Muhammad disputes this paragraph in part. The paragraph reads, "Ms. Muhammad initially denied knowing 'DA Smart,' and suggested he must be associated with her nephew, but after being shown copies of her Facebook messages with him she admitted that she did know him and had not been truthful." (PRDSF ¶ 45.) The only part Muhammad disputes is "being dishonest about knowing Smart." (*Id.*) The deposition testimony to which Muhammad points states that she did not recall being dishonest about DA Smart, and that the only topic of honesty she recalled at the November 23, 2015, meeting was whether Rhodes had given her permission to take the computer.

Because failure to submit properly signed paperwork risked the loss of funding, Kaczmarz forged the "wet" signature of the electronic signer. (*Id.*) Cheers was aware that this happened. (*Id.*) The event came to Zajac's attention, and she and another University employee conducted an investigation of Kaczmarz and Cheers. (*Id.*) Ultimately, neither Kaczmarz nor Cheers was disciplined. (*Id.*) The University cites a number of reasons for the lack of discipline, including that Kaczmarz and Cheers acted with intent to protect the University from negative consequences flowing from the incorrect form of signature, that both recognized that they erred in judgment, that both participated in the investigation, and that there was no harm to the University. (*Id.*)

In her filings, Muhammad also mentions Monica Mitchell, a former Research Nurse in the Department of Medicine's Section of Oncology and Multiple Myleoma, who was terminated in June 2011. (*Id.* ¶ 52.) Like Muhammad, Mitchell is a Black woman. (*Id.* ¶ 53.) The paperwork for Mitchell's termination was filled out by Yaros, who would later head the HR department at the time of Muhammad's termination. (*Id.* ¶¶ 19, 53.) The parties agree that Mitchell was terminated for prescribing medicine outside the scope of her practice as a registered nurse. (*Id.* ¶ 52.) But they dispute the context. For example, Mitchell's declaration—on which Defendants relied in their Statement of Facts—states that the standard procedure was for a nurse to fill out dosages as directed by a doctor onto the doctor's pre-signed prescription pad. (*Id.*) While Defendants contend that a patient received an incorrect dose, Mitchell's declaration states that, while the dosage written on the prescription was incorrect, it was changed quickly enough that no patient received an incorrect dose. (*Id.*) Moreover, Mitchell applied for unemployment— which the University contested—and the State of Illinois Unemployment Office determined that

she was not terminated for misconduct. (*Id.*) She was, however, terminated one day after informing her supervisor that she was four months pregnant. (*Id.*)

After her own discharge on November 23, 2015, Muhammad filed this lawsuit against a number of individuals and the University. She originally alleged violations of § 1981 by the University, as well as Rhodes, Leu, Yaros, and Linder in their official capacities (Count I); violations of § 1981 by Rhodes, Leu, Yaros, and Linder in their individual capacities (Count II); and violations of Title VII by the University (Count III). She also asserted a retaliation claim against all Defendants (also labeled Count III). In response to Defendants' motion to dismiss, Muhammad voluntarily dismissed the retaliation claim and the official-capacity claims against the individual Defendants. (*See* Order on Def.'s Mot. to Dismiss, Dkt. No. 66.) The Court dismissed the remaining § 1981 claims against Yaros and Linder. (*Id.*) Thus, the surviving claims in Muhammad's Second Amended Complaint include a claim under § 1981 against the University, as well as Rhodes and Leu in their individual capacities, and a Title VII claim against the University.

## DISCUSSION

At the summary judgment stage, the Court must determine if a genuine issue of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. Educ. City Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). The Court's function when reviewing a summary judgment motion is to "determine whether there is a genuine issue for trial," not to make determinations of truth or weigh evidence. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018) (citation omitted). In deciding whether there is a genuine issue, the Court must "construe all facts and reasonable inferences" in the light most favorable to the nonmovant— here, that is Muhammad. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

## I. Title VII and § 1981 Claims Against All Defendants

Title VII prohibits employers from discriminating against their employees on the basis of race, among other protected characteristics. *See* 42 U.S.C. § 2000e-2(a). Meanwhile, § 1981 guarantees to all citizens regardless of race "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. In the employment context, Title VII and § 1981 race-discrimination claims have a significant amount of overlap and analysis of the claims is "largely identical." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). The primary difference is the role of race in the challenged employment decision: under Title VII, race need only be a motivating factor, whereas in a claim under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).

In the Seventh Circuit, "plaintiffs can rely on two frameworks to show discrimination." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). One is a "holistic approach" under which courts "look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Id.* (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The other, named after the Supreme Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), entails a "burden-shifting" approach. *Vichio*, 88 F.4th at 691. The parties in this case focus primarily on the burden-shifting approach, and so the Court begins there.

### A. *McDonnell Douglas* Approach

Under the *McDonnell Douglas* framework, a plaintiff must first establish that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Lewis*, 36 F.4th at 759 (citation

omitted). If the plaintiff adequately establishes all four requirements, the employer must

"articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 760.

At that point, the plaintiff must "show why the employer's explanation is pretextual." *Id.*

(citation omitted). There is no dispute that Muhammad, who is Black, is a member of a protected

class, or that she suffered an adverse employment action when she was terminated. But

Defendants claim that she has not satisfied the other two requirements: that she was meeting the

University's legitimate expectations and that similarly situated employees outside her protected

class were treated more favorably than she was treated.

### 1.       Legitimate Expectations

Defendants claim that Muhammad failed to live up to legitimate expectations due to her

misconduct and violation of University policies. In response, Muhammad focuses on her belief

that Rhodes gave her permission to take the computer. She argues that the University had no

reason to believe the initial removal of the computer was theft because (1) that she asked Rhodes

for the password indicated her subjective belief that she had permission, (2) Rhodes apologized

for not being clear as to what items she had permission to take from his office, and (3)

Muhammad had previously gifted University computers to others and the computer was

ultimately returned.

However, Muhammad's narrow focus on whether she had permission to take the

computer misses the point. Muhammad may well have believed that she had permission on that

particular day. But less than twenty-four hours later, she was informed that she did not, in fact,

have permission and that the computer had to be returned. Despite this knowledge, Muhammad

does not appear to have taken any concrete action to return the computer until August 2015—one

month after she knew that she did not have permission to have it—when she first messaged DA

Smart to say she needed to bring it back. (Defs.' Statement of Facts ("DSF"), Ex. 3, Leu Decl. at

11

44, Dkt. No. 143-3.) Muhammad's argument also ignores that she repeatedly misrepresented who had the computer to University administrators during the investigation, to the point that she accepted a day off to drive downstate to retrieve the computer from her nephew despite knowing that it was not there. Each of these actions violated University policy. For example, University policy required employees to act with "honesty and integrity . . . when engaging in activities and performing responsibilities on behalf of the University." (DSF ¶ 12, Dkt. No. 143.) It also required employees to protect confidential information, including unpublished grant proposals and research data such as that located on Rhodes's computer (*id.* ¶¶ 12–13), and to act in the University's best interest in matters relating to their employment (*id.* ¶¶ 14). And University policy also prohibited insubordination. (*Id.* ¶ 17.)

Muhammad attempts to distinguish the legal authority cited by the University, suggesting that the cases it cites demonstrate that termination for insubordination requires a longstanding pattern of employee misconduct or a concession by the employee that they were in fact insubordinate. For example, she attempts to distinguish *Johnson v. Koppers, Inc.*, by pointing out that the plaintiff, who was ultimately fired for insubordination, had been disciplined five times by her employer before her eventual termination. 726 F.3d 910, 912 (7th Cir. 2013). Muhammad, by contrast, had no prior disciplinary history. But nothing in *Johnson* suggests that only a repeat-offender fails to meet her employer's legitimate expectations. Indeed, the court in *Johnson* noted that the plaintiff failed to meet her employer's legitimate expectations due to "a specific incident of insubordination," as opposed to a pattern of behavior. *Id.* at 916.

All that matters is whether the employer believed the employee lived up to its legitimate expectations. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464–65 (7th Cir. 2014) ("If Widmar was not doing what Sun Chemical wanted him to do, then he was not meeting his

employer's legitimate job expectations."). Even if those expectations might be harsh, or even unwise or unfair, it is not the Court's role to determine whether an employer's expectation is "fair, prudent, or reasonable." *Id.* at 464. Here, the University clearly set out its expectations in a variety of policies, and it is undisputed that Muhammad violated a number of those policies, particularly those related to honesty.

In short, there is no genuine issue of material fact as to whether Muhammad had met the University's legitimate employment expectations. For that reason alone, she cannot make out a *prima face* case of discrimination under *McDonnell Douglas*.

### 2.      Similarly Situated Employees

The fourth element of the *McDonnell Douglas* test requires a plaintiff to identify "similarly situated employees outside of the protected class [who] were treated more favorably." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022) (citation omitted). Generally, a plaintiff must show that the comparator had the same supervisor, was subjected to the same standards, and engaged in similar conduct. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (citations omitted). "This is not a magic formula, however, and the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees." *Id.* (citation and internal quotation marks omitted).

Mechanical comparison is particularly dangerous when it comes to the same-supervisor requirement. That a comparator does not share the same direct supervisor is not dispositive: "the real question is whether they were ***treated more favorably*** by the same ***decisionmaker***." *Id.* at 848 (internal quotation marks and citation omitted). Thus, Defendants' contention that Muhammad's chosen comparators—Kaczmarz and Cheers—did not share a direct supervisor with her is not, in itself, persuasive. But Muhammad has admitted that there were only two

13

decisionmakers involved in the investigation of Kaczmarz and Cheers: Zajac and her direct supervisor, KC Goodell. (DSF ¶ 51.) Muhammad has not presented any evidence that either Zajac or Goodell was involved in her own investigation or termination. Thus, there is no shared decisionmaker who could have treated Kaczmarz and Cheers more favorably.

Muhammad does contend that the same HR department, headed by Robinson and then later by Yaros, was involved in both investigations. But "a decisionmaker is the person responsible for the contested decision." *Coleman*, 667 F.3d at 848 (internal quotation marks omitted). And Muhammad's own evidence makes clear that Robinson was not the person responsible for the decision not to terminate Kaczmarz and Cheers. (*See* PRDSF, Ex. 14, Robinson Email, Dkt. No. 149-3.) Indeed, Robinson seemed to think termination might be warranted for Kaczmarz and Cheers. (*Id.* at 2.) Zajac chose not to take such action, however, and the email chain between the two reveals that Robinson acted, at most, in an advisory role. Thus, Robinson did not direct the disciplinary decision or otherwise bear responsibility for it. *See, e.g.*, *Jones v. Nat'l Council Young Men's Christian Ass'ns U.S.*, 48 F. Supp. 3d 1054, 1104 (N.D. Ill. 2014) ("The fact that [the Director of HR] or [the Chief Executive Officer] reviewed performance evaluations made by other supervisors does not establish the existence of a common supervisor.").

Moreover, the misconduct in which Kaczmarz and Cheers allegedly engaged was not similar to the misconduct in which Muhammad allegedly engaged. Notably, Defendants do not claim that Muhammad was terminated solely for removing the computer from Rhodes's office. Rather, they point to a broader pattern of malfeasance: knowingly misleading the University regarding who had the computer, failing to communicate with her supervisors or to retrieve the computer after being informed by Rhodes that she did not have permission to remove it, and

14

failing to inform the University that she knew the computer was not with her nephew in downstate Illinois when she was offered a day off to go retrieve it. By contrast, Kaczmarz and Cheers cooperated with the University's inquiry into their conduct, were found to have acted out of a desire to protect the University (rather than self-interest), and recognized their error in judgment.

Muhammad is correct that the question of whether Kaczmarz and Cheers were similarly situated to her requires more than a rote comparison of job descriptions. But from the evidence presented, even drawing all inferences in Muhammad's favor, Kaczmarz and Cheers are not similarly situated. Their initial conduct, viewed broadly, might appear similar: all three engaged in acts of dishonesty. But the comparison falters from there.[3] Thus, Muhammad's *prima facie* case also falters at the fourth requirement.

### 3. Pretext

Even if Muhammad had established a *prima facie* case of discrimination, she still would not have adduced sufficient evidence that the legitimate reason offered for her termination was actually pretext for discrimination.

"The focus of a pretext inquiry is whether the employer's reason is honest, not whether it is accurate or wise." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). Pretext cannot be mere innuendo; "[a]n employee's attempt to avoid summary judgment cannot succeed unless the employee puts forth evidence suggesting that the employer itself did not believe the proffered reasons for termination." *Burks v. Wis. Dep't Transp.*, 464 F.3d 744, 754–55 (7th Cir. 2006). Muhammad has not put forward any such evidence. At most, she presents her own

---

[3] As noted above, Muhammad also identifies Mitchell, a Black nurse, as another employee she believes to have been treated poorly. But while Muhammad mentions Mitchell in her SAF and in a footnote of her brief's factual background section, she makes no argument about Mitchell in her brief.

deposition testimony that Leu, who headed her investigation, was a "blatant" racist and that she had refused to allow Muhammad to take unspecified professional development classes in the past. (Pl.'s Opp'n at 13, Dkt. No. 148; PRDSF ¶¶ 60, 80.) But, as Muhammad recognizes, Leu was not the sole investigator on her case—Yaros and Lindner also participated. (PRDSF ¶ 81.) And Muhammad does not connect the dots between Leu's purported racism and the ultimate decision to terminate her.

Muhammad also points to statements that Grutter, her union representative, purportedly made to her regarding the motives for the investigation. According to Muhammad, Grutter told her that "the doctor never gets held responsible for these cases . . . if Dr. Rhodes doesn't just say it was his mistake, I believe that you are not going to have your job," and further that "the doctor" had caused several people to lose their jobs. (*Id.* ¶ 73.) But even putting aside the questionable admissibility of Grutter's out-of-court statements, it is unclear how such statements support a reasonable inference that Muhammad's job was in jeopardy due to racial animus. If anything, Grutter's statements suggest that Muhammad might be made a scapegoat ***to protect Rhodes*** and that such scapegoating had happened in the past. But none of the statements attributed to Grutter indicate that Muhammad was actually being treated poorly because of her race.

In the end, there is no genuine dispute that Muhammad had violated a number of University policies. The University's Progressive Corrective Action Policy expressly allows the University to suspend or discharge an employee on the first instance of "serious misconduct," including theft, misuse of University property, insubordination, and misuse of confidential information. (DSF ¶ 17.) While such a policy may seem harsh, the Court is not tasked with evaluating the propriety of the University's policy. *Widmar*, 772 F.3d at 464. Rather, the Court

16

must determine whether the University's explanation for Muhammad's termination stands on legitimate footing. It does.

### B.     The *Ortiz* Inquiry

Of course, Muhammad is not required to rely on the *McDonnell Douglas* burden-shifting approach to establish a viable claim of discrimination. As the Seventh Circuit explained in *Ortiz*, when considering the summary judgment record, the Court may simply "look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Vichio*, 88 F.4th at 691 (citing *Ortiz*, 834 F.3d at 765). Yet Muhammad's claim fairs no better under this "holistic" approach. *Id.*

Muhammad's argument here turns on (i) her testimony that she felt her termination was based on race, and (ii) her testimony about Leu's alleged prior racial bias regarding Muhammad's attempt to take professional development classes and Muhammad's eventual reporting of Leu to HR.[4] As an initial matter, Muhammad's subjective feeling that her termination was based on her race does not suffice to meet her burden to point to admissible evidence of discriminatory animus. "Bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001).

Here, Muhammad asks for too attenuated an inference to be drawn from Leu's alleged bigotry. Muhammad speculates that, because Leu allegedly exhibited animus in the past, that animus drove the University's decision to terminate her. But the only evidence Muhammad offers is her own speculative testimony. (*See, e.g.*, PRDSF ¶ 76 ("When asked if she felt

---

[4] Leu disputes whether Muhammad ever asked to take professional development classes, and Robinson disputes whether Muhammad ever reported Leu to HR. (DRPSAF ¶¶ 60, 80.)

17

discriminated against, and why, Ms. Muhammad stated, 'I do . . . Because of how I was handled, the treachery of how I was handled. The team that I thought we were, and how this miscommunication, the lack of investigation, the harshness of it all. I was like, wow, is it because I'm black?'").) Muhammad claims that Leu exhibited racial bias by refusing to approve her request to take professional development classes. (*Id.* ¶ 80.) But Leu testified that Muhammad never asked to take the classes, and Muhammad does not specify which classes she asked to take or how they related to her position. Nor does she offer any other explanation for how Leu's handling of her request exhibited racial animus.[5]

Muhammad is entitled to have all reasonable inferences drawn in her favor at the summary judgment stage. But *Ortiz* requires the Court to consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765. And here, the evidence as a whole includes ample undisputed evidence that Muhammad lied repeatedly during the investigation about her taking of the computer and her unjustifiable delay in returning it for months. The undisputed evidence further shows that the computer contained confidential information regarding ongoing research from one of Rhodes's grant projects that had been cleared from the computer when it was finally returned. On the other hand, Muhammad has pointed to no evidence that either Yaros or Lindner, two of the three investigators, ever exhibited racial animus. Nor does Muhammad adduce sufficient evidence to link Leu's alleged racism to her termination. In sum, viewing the evidence as whole, no

---

[5] Muhammad also mentions the general "buzz" in the hospital but offers no specifics as to what she means. (*Id.* ¶ 77.) Notably, when pressed in her deposition to elaborate on the "buzz," Muhammad offered no specifics and said that "[n]o one made any specific comments" during her investigation "that indicated that this was related to [her] race." (DSF, Ex. 6, Muhammad Dep. 141:2–6, Dkt. No. 143-6.).

reasonable juror could conclude that the decision to terminate Muhammad was based on race rather than her violations of University policy.[6]

## II. Section 1981 Claim Against Rhodes

For the reasons discussed above, Muhammad has failed to demonstrate that there is a genuine dispute of fact as to whether any Defendant discriminated against her based on her race. Thus, her § 1981 claims in Counts I and II fail as a matter of law as to all Defendants against whom they are asserted. But even if Muhammad had managed to avoid summary judgment with respect to her § 1981 claim against the University, her § 1981 claim against Rhodes would still fail for the alternative reason offered by Defendants' motion.

Defendants argue that to be liable under § 1981, an individual defendant must have personally participated in, or had control over, the adverse employment decision. Defendants point out that Muhammad has adduced no evidence that Rhodes either participated in or had control over the decision to terminate Muhammad. For her part, Muhammad agrees that Rhodes "did not directly participate in the termination," but nonetheless claims that "his input was central to the decision." (Pl.'s Opp'n at 15.) In so doing, she appears to be invoking a "cat's paw" theory under which "the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012), *overruled on other grounds by Ortiz,* 834 F.3d at 764. The theory requires evidence of two things: "that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action,

---

[6] Because Muhammad cannot establish the elements of her race-discrimination claims, the Court need not reach Defendants' argument that her Title VII claim is time-barred.

and . . . that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson*, 726 F.3d at 914.

Muhammad, however, has not demonstrated a genuine dispute of material fact as to whether Rhodes harbored discriminatory animus against her. *See id.* at 915 (declining to "draw inferences that are supported by only speculation and conjecture" (internal quotation marks omitted)). The totality of Muhammad's evidence that Rhodes harbored racial animus against her is that he used the phrase "felony theft" when discussing her removal of the computer from his office, which she considered racist. This incident occurred in late August 2015, well over a month after Rhodes first asked Muhammad to return the computer and over a month before Muhammad told Leu that she had taken a computer. (Pl.'s Opp'n at 3.) No reasonable juror could find racial animus under these circumstances solely based on Rhodes telling Muhammad that her failure to return the computer was felony theft. And Muhammad has failed to present any additional evidence—not even her own testimony—that Rhodes harbored racial animus. Rhodes is thus entitled to summary judgment in his favor on Muhammad's individual-capacity § 1981 claim for this reason as well.

### CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 141) is granted. Judgment will be entered in favor of Defendants.

ENTERED:

Dated: September 30, 2024

_____
Andrea R. Wood
United States District Judge

20